UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| WALTER SOBCZAK d/b/a | ) | |
| S & S CARPENTER CONTRACTOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:05-CV-430 PS |
| | ) | |
| TOWN OF WINFIELD and | ) | |
| WILLIAM TEACH, Individually and as | ) | |
| Town Council President and Town | ) | |
| Building Commissioner, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

In the spring of 2005, Plaintiff Walter Sobczak was working as a general contractor under the name S & S Carpenter Contractor in the town of Winfield, Indiana much as he had done each of the prior three years. His understanding, based on a conversation with a town official in 2002, was that he could operate as a general contractor using just his specialty carpentry license. Each year, including 2005, he renewed his license with the Town without incident, even though, since at least 2004, a Town ordinance required all would-be general contractors to first pass the Lake County general contractor's test before applying for a license in Winfield.

When William Teach, a town councilman,[1] got wind that the list of registered subcontractors working on one of Sobczak's job were not the subcontractors who were actually doing the work, he investigated the matter. Upon reviewing Sobczak's paperwork, he concluded

---

[1] Although Plaintiff alleged that Teach was the Town Building Commissioner, Teach testified that he never held that position, and served solely as a town councilman. (DE 25-3 at 7-8.)

1

that Sobczak's license was invalid because he had not taken the general contractor's test, and put a stop to all of Sobczak's work in the town.

Sobczak then sued Teach and the Town, claiming that they had denied him equal protection, tortiously interfered with his business relationships, and made defamatory statements about him.  He later claimed that the Town revoked his license without due process.  Before the Court is Defendants' motion for summary judgment.  Because Plaintiff was not denied any of his constitutional rights, summary judgment on the federal claims is granted, and the state law claims are remanded to state court.

## I. BACKGROUND

Walter Sobczak and his company, S & S Carpenter Contractor, did business in the Town of Winfield for seven or eight years.  (DE 25-2 at 7.)  During this period, Sobczak sometimes served as the general contractor on jobs and sometimes served as a carpentry subcontractor. (DE 25-2 at 4, 7.)  Around August 22, 2001, Sobczak filed an application with the Town of Winfield to work as a general contractor.  (DE 25-3 at 2.)  He was assisted in the application process by a Town employee, Wilbur Cox, whom Sobczak says was then Winfield's building commissioner. (DE 25-2 at 15-16.)  Though the record is not clear regarding what the exact requirements for a Winfield general contractor's license were at the time, Cox told Sobczak to bring in his insurance information, bond, proof of workmen's compensation, and all his licenses from the towns and municipalities in the area.  (DE 25-2 at 21-23.)  Sobczak provided the documentation and paperwork requested by Cox, paid a fee and received his Winfield general contractor's license in the mail shortly thereafter.  (DE 25-2 at 20-23.)

Sobczak renewed his Winfield general contractor's license annually for the years 2002-2004 without incident.  (DE 25-2 at 23-24.)  But the Winfield building ordinances were amended

in 2004 to require any applicant for a license in a building trade to have passed any Lake County exam that exists for that particular trade:

> The town hereby requires that any applicant wishing to be licensed by the town for any trade including but not limited to plumbing, roofing, heating and air conditioning, carpentry, or insulation for which the County Plan Commission, by its Building Department, has a test or testing procedures, is first required to successfully take the examination for the particular trade in question and shall be required to retest as is required by the County Plan Commission's rules and regulations, as amended from time to time. . . .

Winfield, Indiana Code of Ordinances, § 111.16(A) (*see* DE 25-4 at 7). The Code also states that "[n]o person [or] firm . . . shall furnish any labor or supervision in the town unless and until that person [or] firm . . . shall have been duly registered and meet all the requirements in the manner provided by the town." Winfield Code, § 111.05(C). Sobczak does not contest that these ordinances were in place in 2005, or that Lake County offers an examination for general contractors.

Near the end of 2004, Sobczak filed an application to renew his general contractor registration for 2005. (DE 25-4 at 13.) By signing the 2005 renewal form, Sobczak affirmed, "I currently hold a valid, active contractor registration from the Town of Winfield for this company or individual, and the information supplied with that application is current, accurate, true and complete; and that there have been no changes in the information supplied with that registration." (*Id.*) The form did not mention the change in the 2004 ordinance, nor did it ask for information about whether the applicant had taken Lake County's trade examinations.

At the time he applied for the 2005 general contractor's license, Sobczak had not taken the Lake County general contractor examination. (*See* DE 25-2 at 10, 12.) However, he submitted his Lake County specialty carpenter license, marked "Gen. Spec. / Carpentry," with his Winfield application. (*Id.*; *see also* DE 25-4 at 14.) It is not clear whether the Town

3

generally issues a license or a receipt reflecting that an application was granted, and no such document appears in the record. However, Defendants concede that Sobczak's application was processed by a Town employee as though it were a valid application for a general contractor license. (DE 25 at 4.) Consequently, Sobczak believed that he had a valid license, and that everything was business as usual.

In the spring of 2005, Sobczak was hired by William Tsouklis, a home builder, for three projects near 7737 Kirby Circle in Winfield. (DE 25-2 at 13-14; see also DE 25-3 at 11-12.) Sobczak went to the Town to get a building permit, but he ran into interference from William Teach, a Winfield town councilman. (DE 25-2 at 7; DE 27-10 at 2-3.) According to Sobczak, Teach had a problem with Tsouklis because Tsouklis did work on his houses even though he didn't have a general contractor's license, and because one of Tsouklis's homes had caught fire years before because of electrical problems. (DE 25-2 at 27-28.) Sobczak testified that Teach said he wanted to force Tsouklis not to build in Winfield and to put his lots up for sale. (DE 27-10 at 2-3.) Sobczak admits that Teach's comments were directed toward Tsouklis, not toward Sobczak himself. (DE 25-2 at 28.)

Sobczak said Teach spoke to him at least five additional times on the job or over the phone. (DE 25-2 at 26.) Sobczak said these conversations included threats to "have somebody taking pictures, watching if Tsouklis would do any work on the job. And that I would be responsible for everything that . . . was going on." (DE 25-2 at 26.) Sobczak also said Teach threatened him with loss of his license, fines, and "other problems down the road." (DE 25-2 at 30.) Teach told him, "There's going to be problems down the line, and it's best to have you . . . not be in it." (DE 25-2 at 33.)

4

At his deposition, Teach acknowledged that he talked with Sobczak when he was applying for a building permit. Teach said he told Sobczak that he had no problem with him actually serving as the general contractor on the job, but that he didn't want Sobczak to be the front for someone else (Tsouklis, presumably) working as a general contractor on Tsouklis's project. (DE 25-3 at 15-16.)  Teach also recalled having several other conversations with Sobczak in the spring of 2005.  (DE 25-3 at 29.)  He testified that, in the course of driving by the construction site on a regular basis, he observed that the contractors who were listed on the permit were not always the ones doing the actual work.  (DE 25-3 at 30.)  Teach said that in his conversations with Sobczak, he "cautioned Walter to be sure that he was functioning as the general contractor on the job."  (DE 25-3 at 29.)

Teach said that, sometime after this, it came to his attention that Sobczak had submitted incorrect paperwork when applying for the 7737 Kirby Circle building permit.  (DE 25-3 at 13.) Teach said he responded by inquiring into the type of license Sobczak had in Lake County.  (*Id.*) After discovering what he characterized as a "discrepancy" between Sobczak's actual licensing in Lake County and what Sobczak was representing his licensing to be, Teach said that he turned the matter over to the Town Attorney, Todd Etzler, who handled it from that point on. (DE 25-3 at 13-14.)

On April 13, 2005, Etzler sent a letter to Sobczak and Tsouklis regarding Lot 197 in the Country Meadows Subdivision of Winfield.  The letter stated that the proposal for the project implied that Tsouko Construction[2] was to perform labor or supervision of construction on the project, even though it was not a registered contractor in the Town.  Etzler warned that if S&S

---

[2] The record references both "Tsouko Construction" and "Tsouklis Construction." It is unclear whether these are the same company or related companies, but they are both apparently owned by William Tsouklis.

5

was allowing Tsouko to avoid the registration requirements by "generaling out" to another general contractor, all parties in violation of the registration requirements could be fined up to $2,500 per day. (DE 25-5 at 5.) Teach was copied on the letter. (*Id.*)

Some time later, a stop work order was placed on the 7737 Kirby Circle project; according to Teach, this was done by Winfield's building commissioner, Tom Richardson. (DE 25-3 at 14.) Teach speculated that Richardson had issued the stop order based on the advice of Todd Etzler, the Town Attorney. (*Id.*) Teach said he did not issue the stop work order himself. (*Id.*) Teach also said he did not recall personally directing anyone to issue a stop work order. He also said he did not recall any occasion, after the stop work order was issued, when he personally told Sobczak to cease working. (*Id.* at p. 34.)

Etzler sent a second letter to Sobczak on May 26, 2005, accusing Sobczak of filing "false papers" indicating that he was a licensed general contractor in Lake County. (DE 25-5 at 6.) The letter also stated that Sobczak was acting as a general contractor in Winfield without a valid license. (*Id.*) The letter stated that a stop work order had been placed on the 7737 Kirby Circle project, and stated that a fine of $2,500 per day would be levied from the date of filing the application to the date of entry of the stop work order – a total of $72,500. (*Id.*) Etzler again copied William Teach on this letter. (*Id.*) Sobczak never paid the fine; indeed, the Town has brought a counter-claim seeking payment of the fine. (DE 10.)

Sobczak's attorney, Mark Psimos, sent a response to Etzler's May 26 letter on June 3, 2005. (DE 25-3 at 4.) He took the position that Sobczak was properly licensed as a general contractor in Winfield because Wilbur Cox had told Sobczak that his general carpentry registration in Lake County was sufficient to allow him to act as a general contractor in Winfield. (*Id*.) He stated, "Additionally, Mr. Sobczak relates that he is, in fact, licensed as a

6

general contractor within the Town of Winfield," although he did not offer support for that assertion.

Etzler responded on June 6, 2005, reiterating that Sobczak's company was in violation of the town ordinance, stating that Sobczak's specialty carpenter's license would not satisfy the requirements of a general contractor's license.  (DE 25-4 at 30.)  He stated that he was not sure whether an exemption ever existed that would have allowed Sobczak to act as a general contractor having only been given a general carpentry license, but that such an exemption no longer existed.  (*Id*.)  Eztler again accused S&S and other contractors of "ghosting"; *i.e.*, acting as the general contractor in name only, while Tsouklis performed the real work on the project.  (*Id*. at 30-31.)  Teach was again copied on the letter.

Plaintiff testified that having his license revoked cost him approximately $90,000 in jobs on three houses for Tsouklis.  (DE 27-6 at 1, DE 25-4 at 19.)  Sobczak tried to remedy the problem by simply taking the Lake County general contractor's exam after his license was taken away, but he failed the exam.  (DE 25-2 at 10-12.)  Sobczak then filed suit in Lake Superior Court against the Town of Winfield and William Teach, alleging tortious interference with business and contractual relations, defamation, and violation of his equal protection rights as well as other unnamed constitutional rights.  Defendants removed the case to this Court, took discovery and then moved for summary judgment.

## II. DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment carries the initial burden of

7

demonstrating an absence of evidence to support the position of the non-moving party. *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). The non-moving party must then set forth specific facts showing there is a genuine issue of material fact and that the moving party is not entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). A genuine dispute about a material fact exists only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). In making this determination, the Court must draw every reasonable inference from the record in the light most favorable to the non-moving party. *Haefling v. United Parcel Serv., Inc.*, 169 F.3d 494, 497 (7th Cir. 1999).

**A. Federal claims**

    **1. Equal protection**

Plaintiff alleges that the defendants violated 42 U.S.C. § 1983 by denying him "equal protection afforded to other contractors under the law" (DE 1 at 4) and that defendant Teach directed a vindictive campaign against him (DE 26 at 8-9). An individual may state a claim under the Equal Protection Clause if he can show that the government took an action that "was a spiteful effort to 'get' him for reasons wholly unrelated to any legitimate state objective." *Esmail v. Macrane*, 53 F.3d 176, 180 (7th Cir. 1995). This is referred to as a "class of one" type of discrimination. *Indiana State Teachers Ass'n v. Bd. of Sch. Comm'rs*, 101 F.3d 1179, 1181-82 (7th Cir. 1996). For such a claim to succeed, the plaintiff must demonstrate that the cause of the differential treatment is a "'totally illegitimate animus toward the plaintiff by the defendant.'" *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001) (quoting *Olech v. Vill. of Willowbrook*, 160 F.3d 386, 388 (7th Cir. 1998)). "Ill will must be the *sole* cause of the complained-of action." *Albiero*, 246 F.3d at 932. To prevail, the plaintiff must demonstrate that

the government treated him differently than other individuals who are prima facie identical in all relevant respects. *Id.*

Sobczak's equal protection claim is utterly lacking in merit. He suggests that Defendants had a vendetta against William Tsouklis, the owner of the properties he was working on, and that this motivated their negative treatment of him. This argument fails on its face because it acknowledges that it was Teach's suspicion of Tsouklis, not Sobczak, that motivated an investigation into Sobczak's license. Even assuming that Sobczak could claim that Teach had some derivative ill will toward Sobczak because he worked with Tsouklis, there is nothing to indicate that any animus Teach had was illegitimate. To the contrary, the record supports the conclusion that Teach initially acted based on safety concerns about homes that Tsouklis had built in the past.

Moreover, it is evident that the town attorney (Etzler) and the town building commissioner (Richardson) were the individuals who ultimately enforced the ordinances by corresponding with Sobczak and imposing the stop-work order. There is nothing in the record that either of those men acted with any ill will toward either Sobczak or Tsouklis. Rather, all indications from the record support that they were merely enforcing the Town's legitimate licensing ordinances, which promote building safety.

Lastly, Sobczak has not shown that he was treated differently than some other contractor who was identical to him in all relevant respects. *Albiero*, 246 F.3d at 932. Although his complaint alleges that he was treated differently than "other contractors under the law, as they are given work within the Town and other areas in the County" (DE 1 at 4), nothing in the record supports this contention. Critically, Sobczak has not adduced evidence that others *who were in violation of Winfield ordinances* – as he was – were treated more leniently than him.

9

### 2. Procedural due process

In response to Defendants' motion for summary judgment, Sobczak also argues that Defendants violated his due process rights by taking away his general contractor's license without a hearing.  (DE 26 at 5, 6-8.)  Defendants have moved to strike this claim or extend discovery on this narrow issue, arguing that the complaint did not fairly put them on notice of a procedural due process claim.  Sobczak, however, argues that the claim is implicit in his complaint and was raised implicitly during discovery.  Although it is true that the complaint mentions only the equal protection claim specifically and then vaguely references "other state and federal constitutional rights of the plaintiff" (Compl. ¶ 13), the Court concludes that the factual record with respect to the due process claim is adequately developed to allow its determination on summary judgment.

To establish a due process violation under 42 U.S.C. § 1983, a plaintiff must show: (1) the existence of a cognizable property interest; (2) deprivation of that interest; and (3) a denial of due process.  *Licari v. City of Chicago*, 298 F.3d 664, 668 (7th Cir. 2002).  To qualify as property for due process purposes, a plaintiff must have "a legitimate claim of entitlement," which is "defined by existing rules or understandings that stem from an independent source such as state law . . . ."  *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).

Sobczak argues that he had a property interest in his general contractor's license.  Indeed, renewal of a license can be considered a cognizable property interest.  *Easter House v. Felder*, 910 F.2d 1387, 1395 (7th Cir. 1990).  In *Easter House*, the Seventh Circuit observed that statutory and regulatory limitations upon an agency's authority to deny license renewals can create a legitimate claim of entitlement to renewal.  *Id*.

10

In this case, Sobczak points generally to Indiana Code § 22-11-3.1-1 *et seq.*, which deals with licensing of contractors in Lake and Porter Counties, to support his argument that a contractor's license stems from state law. (DE 26 at 7.) But Sobczak fails to explain how this section establishes his entitlement to a license. The only provision that could arguably help him is Section 22-11-3.1-4, which states:

> A license issued by a county having a unified license bond or a city or town within that county is valid until the contractor to whom the license was issued fails to perform any work under that license for a period of five (5) years, in which case the license expires. This section does not prohibit a county, or a city or town within that county, having a unified license bond from requiring an annual renewal fee in accordance with section 3 of this chapter.

Ind. Code § 22-11-3.1-4. Insofar as this provision states that a license is valid until the holder of the license has been inactive for five years, this provision could conceivably be construed as preventing a town from denying renewal to licensees who do not meet newly enacted regulations. Under this interpretation, all existing licensees would be grandfathered in under the regulatory regime that was operative when they originally obtained their licenses.

But such a broad reading of § 22-11-3.1-4 is not sensible. Section 22-11-3.1-3 explicitly states that towns may require contractors to be licensed in order to do business in that town. Section 22-11-3.1-4 itself permits towns to require licensed contractors to apply for renewal each year. It is implicit in those provisions that a town may change its requirements from year to year and expect existing licensees to adhere to them upon renewal. Therefore, there is no basis to infer that state law gave Sobczak some kind of entitlement to his general contractor license regardless of whether he actually met the requirements for that license. And the Town's ordinances specifically state that no one shall furnish labor in the town until that person "shall have been duly registered *and* meet all the requirements in the manner provided by the town."

11

(DE 25-4 at 6 (emphasis added).)  Thus, while the Town provides substantive criteria which, if met, might dictate the issuance of a contractor's license, nothing in the ordinances could be construed to convey an entitlement to a contractor's license to someone who did not meet the requirements.

Nor can Sobczak claim that the 2005 general contractor's license that he received from the Town in error somehow ripened into a property interest because he relied upon it – essentially, an estoppel argument.  If he was never entitled to the license, he cannot claim a property interest in it.  *Bone v. City of Lafayette*, 919 F.2d 64, 65 (7th Cir. 1990); *Boczar v. Kingen*, 2000 WL 1137713, at *23 (S.D. Ind. Mar. 9, 2000) (plaintiffs had no property interest in building permits that were issued based on a mistake of fact and in violation of ordinance, citing *Bone*), *aff'd*, 6 Fed. Appx. 471 (7th Cir. 2001); *see also Mellin v. Flood Brook Union Sch. Dist.*, 790 A.2d 408, 421 (Vt. 2001) (state's repeated erroneous issuance of elementary teaching license did not create property interest in renewal, where teacher was never qualified for the license in the first place); *Snyder v. City of Minneapolis*, 441 N.W.2d 781, 792 (Minn. 1989) (building permit issued by mistake confers no vested property right).

In *Bone*, a case with striking similarities to this one, the city of Lafayette, Indiana issued a building permit for a second home on a single parcel of land, even though under local zoning rules, a second home could not be built unless the parcel had been subdivided.  919 F.2d at 64.  When Ms. Bone tried to build a third house on the land, the city engineer and building inspector specifically went over her proposal with her without calling the problem to her attention, and told her to go ahead and build.  *Id.* at 65.  She submitted an application for the building permit, certifying that the plans complied with all applicable laws, and the Lafayette Board of Public Works issued the permit.  It was only after a neighbor complained, six weeks after building had

12

commenced, that the City put a stop order on the project. When her lender asked why the stop order had been issued, the city engineer responded that Bone had lied about complying with all applicable laws. Bone did not appeal the stop order to the county board of zoning appeals, and instead filed a lawsuit in state court, which she lost. She then filed a federal lawsuit, alleging that the stop order deprived her of property without due process of law, and that the city engineer had defamed her. Although *Bone* primarily dealt with the defamation claim, the Seventh Circuit noted: "The permit itself was not 'property' because under state law a permit issued in violation of law is void. Because the Bone residence did not comply with the controlling zoning ordinances . . . the permit was invalid from the start." *Id*. (quotation omitted).

The Winfield Code requires all general contractors to pass the Lake County general contractor's exam. Plaintiff admits that he did not take the Lake County exam until after the stop-work order was placed on the project, and when he did take the exam later on, he failed it. Therefore, Plaintiff's license was granted in violation of law, making it void. Plaintiff never had a legal property interest in his license.

**B. State Law Claims**

Jurisdiction in this court over Plaintiff's Indiana state law claims and Defendant's counterclaim arises under the supplemental jurisdiction provisions of 28 U.S.C. §1367. However, it is presumptively appropriate to remand supplemental state law claims to state court when the federal claims drop out before trial. *Cadleway Props., Inc. v. Ossian State Bank*, 478 F.3d 767, 769-70 (7th Cir. 2007). This general rule is designed to "minimize the occasions for federal judges to opine on matters of state law." *Van Harken v. City of Chicago*, 103 F.3d 1346, 1354 (7th Cir. 1997).

As set forth above, summary judgment in favor of defendants is granted with respect to Plaintiff's federal claims.  Now that no federal claims remain, the remaining Indiana state law claims are appropriately handled by the Indiana state courts, and they are remanded to the Lake Superior Court of Lake County pursuant to 28 U.S.C. § 1367(c)(3).

### III. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (DE 24) is **GRANTED** with respect to Plaintiff's equal protection and procedural due process claims. Defendants' motion to strike Plaintiff's due process argument and motion for leave to conduct discovery of Plaintiff's procedural due process claim (DE 29 and 31) are **DENIED**.  Plaintiff's state law claims and Defendants' counter-claim are **REMANDED** to the Lake Superior Court. The clerk shall treat this matter as **TERMINATED**.

**SO ORDERED.**

ENTERED: October 11, 2007

s/ Philip P. Simon<br>PHILIP P. SIMON, JUDGE<br>UNITED STATES DISTRICT COURT